**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | |
| MSP RECOVERY CLAIMS, SERIES | : | |
| LLC and MSPA CLAIMS 1, LLC, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 19-21607 (FLW) (ZNQ) |
| v. | : | |
| | : | |
| ABBOTT LABORATORIES, ABBOTT | : | |
| DIABETES CARE, INC., ABBOTT | : | **OPINION** |
| DIABETES CARE SALES CORP., | : | |
| BAYER HEALTHCARE, LLC, | : | |
| ASCENSIA DIABETES CARE U.S. INC., | : | |
| LIFESCAN, INC., JOHNSON & | : | |
| JOHNSON, and ROCHE DIAGNOSITCS | : | |
| CORP., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WOLFSON, Chief Judge**:

Plaintiffs MSP Recovery Claims, Series, LLC ("MSP Recovery") and MSPA Claims 1, LLC ("MSPA Claims") (together, "Plaintiffs") have filed a Complaint against Defendants Abbott Laboratories ("Abbott Labs"), Abbott Diabetes Care, Inc. ("Abbott Diabetes"), Abbott Diabetes Care Sales Corporation ("Abbott Diabetes Sales"), Bayer Healthcare LLC ("Bayer Healthcare"), Ascensia Diabetes Care US, Inc. ("Ascensia"), Lifescan, Inc. ("Lifescan"), Johnson & Johnson, and Roche Diagnostics Corporation ("Roche") (together, "Defendants"), alleging that Defendants, which develop, manufacture, market, and sell blood glucose testing equipment, violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and various state consumer protection laws. Plaintiffs further assert state common law fraud and unjust

enrichment claims against Defendants.[1]  Before the Court is a Motion to Dismiss filed jointly by Defendants pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the reasons stated herein, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, Plaintiffs' RICO claims (Counts X to XII), and their claims under the Arizona Consumer Fraud Act, West Virginia Consumer Credit and Protection Act, and Wisconsin Deceptive Trade Practices Act are **DISMISSED WITH PREJUDICE**; and Plaintiffs' claims under the Hawaii Unfair or Deceptive Acts and Practices Act and New York General Business Law are **DIMISSED WITHOUT PREJUDICE**.  Plaintiffs' common law fraud and unjust enrichment claims under New Jersey and Indiana law are **DISMISSED** as withdrawn.  Defendants' Motion to Dismiss is **DENIED** with respect to the common law fraud and unjust enrichment claims under Illinois and Pennsylvania law, and the claims pursuant to the Arkansas Deceptive Trade Practices Act, Connecticut Unfair Practices Act, Delaware Consumer Fraud Act, Delaware Uniform Deceptive Trade Practices Act, Florida Deceptive and Unfair Trade Practices Act, Idaho Consumer Protection Act, Indiana Deceptive Consumer Sales Act, Massachusetts Regulation of Business Practice & Consumer Protection Act, Michigan Consumer Protection Act, Minnesota Private Attorney General Statute & Consumer Fraud Act, Minnesota Uniform Deceptive Trade Practices Act, Nebraska Consumer Protection Act, Nevada Deceptive Trade Practices Act, New Hampshire Consumer Protection Act, New Mexico Unfair Trade Practices Act, North Dakota Unlawful Sales or Advertising Practices Law, Ohio Deceptive Trade Practices Act, Pennsylvania Unfair Trade and Consumer Protection Law, South Carolina Unfair Trade Practices

---

[1]    In their Opposition to Defendants' Motion, Plaintiffs withdraw the following claims:  (1) common law fraud against the Bayer Defendants and Johnson & Johnson under New Jersey law (Count XIV), common law fraud against Roche under Indiana law (Count XV), and unjust enrichment under New Jersey and Illinois law (Count XVIII).  The Court, therefore, does not address Defendants' arguments as they relate to these counts.

Act, Tennessee Consumer Protection Act, and Virginia Consumer Protection Act of 1977.

## I.    BACKGROUND

### A.  The Parties

MSP Recovery is a Delaware limited liability company with a principal place of business in Coral Gables, Florida, the members of which are citizens of Florida and Texas.  (Compl. ¶ 10.) MSP Claims is a Florida limited liability company, also with a principal place of business in Coral Gables, Florida.  (*Id.* ¶ 11.)  The members of MSP Claims are citizens of Florida.  (*Id.*)  Plaintiffs have been assigned recovery rights by numerous third-party payors, including  Medicare Advantage Plans ("MA Plans"), Medicare Advantage organizations, health maintenance organizations, management service organizations, and other first-tier and downstream entities across the United States (collectively, "Plaintiffs' Assignors").  (*Id.* ¶ 12.)  Plaintiffs' Assignors administer Medicare benefits for Medicare enrollees under Medicare Part C and Part D.  (*Id.* ¶ 25.)

Abbott Labs is an Illinois corporation with a principal place of business in Illinois.  (*Id.* ¶ 13.)  Abbott Labs manufactures and markets healthcare products, including the Freestyle brand of diabetes test strips (which includes the Lite, InsuLinx, and Precision Neo varieties).  (*Id.* ¶ 13.) Abbott Diabetes is a Delaware Corporation with a principal place of business in Illinois.  (*Id.* ¶ 14.) Abbott Diabetes is a wholly owned subsidiary of Abbott Labs, and develops and sells glucose monitoring systems, including test strips.  (*Id.*)  Abbott Diabetes Sales is also a wholly owned subsidiary of Abbott Labs and is a Delaware corporation with a principal place of business in Illinois.  (*Id.* ¶ 15.)  Abbott Diabetes Sales markets and sells glucose monitoring systems, including test strips.  (*Id.*)[2]

---

[2]    The Court refers to Abbott Labs, Abbott Diabetes, and Abbott Diabetes Sales, together, as "Abbott."

Bayer Healthcare is a Delaware limited liability company with a Pennsylvania principal place of business whose members are citizens of Delaware, New Jersey, Pennsylvania, Germany and the Netherlands.  (*Id.* ¶ 17.)  Bayer Healthcare produced test strips under the names Contour, Contour Next, and Breeze2, until Bayer Diabetes Care was acquired by Panasonic Healthcare Holdings in 2016.  (*Id.*)  Ascencia is a Delaware corporation with a principal place of business in New Jersey.  (*Id.* ¶ 18.)  Ascencia was established in 2016 through the acquisition of Bayer Diabetes Care by Panasonic Healthcare Holdings and currently produces Contour, Contour Next, and Breeze2 test strips.  (*Id.*)[3]

Johnson & Johnson is a New Jersey corporation with a principal place of business in New Jersey.  (*Id.* ¶ 20.)  Johnson & Johnson manufactures and markets healthcare products, such as the OneTouch brand of test strips, which includes the Ultra and Verio varieties.  (*Id.*)  Lifescan is a California corporation with a principal place of business in Pennsylvania.  (*Id.* ¶ 21.)  Lifescan is a wholly owned subsidiary of Johnson & Johnson that develops and sells blood glucose monitoring systems, including test strips.  (*Id.*)

Roche is an Indiana corporation with a principal place of business in Indiana.  (*Id.* ¶ 23.)  Roche manufactures the Accu-Check brand of test strips, including the Guide, Aviva, Aviva Plus, Compact, SmartView, Performa, and Active varieties.  (*Id.*)

### B.  Diabetes & Glucose Test Strips

Diabetes is a disease that causes elevated blood glucose levels and can be severely debilitating or fatal if left untreated.  (Compl. ¶¶ 34–35.)  Diabetics either do not make enough insulin, a hormone made by the pancreas that enables glucose to be absorbed into cells and converted into energy, or do not use insulin well, resulting in glucose not being absorbed by the

---

[3]      The Court refers to Bayer Healthcare and Ascencia, together, as "Bayer."

cells. (*Id.* ¶ 34.) Diabetes affects nearly 30 million Americans, approximately 10% of the population. (*Id.* ¶ 1.)

Self-monitoring of blood glucose is core component of managing the disease. (*Id.* ¶ 36.) In order to avoid episodes of high blood sugar ("hyperglycemia") and low blood sugar ("hypoglycemia"), diabetics must monitor their blood glucose concentration several times daily to properly manage their diet and insulin needs. (*Id.*) Defendants manufacture blood glucose test strips and testing meters. (*Id.* ¶¶ 1–3.) Glucose meters, like those manufactured by Defendants, are used to self-monitor blood glucose levels. (*Id.* ¶ 38.) Users place a small drop of blood on a one-time-use test strip that measures blood glucose concentration. (*Id.*) The meter interprets the result and displays it numerically. (*Id.*) Glucose meters are often sold for a nominal amount or given to patients for free. (*Id.* ¶ 102.) However, to use the glucose meter patients must use compatible test strips from the meter manufacturer. (*Id.*) Test strips can cost one dollar or more per strip. (*Id.*) Plaintiffs allege that the high price of test strips is not due to production expenses or significant product development, but rather it is the result of rebates and reimbursements paid to pharmaceutical benefit managers ("PBMs"). (*Id.* ¶ 103–04.)

### C. Medicare

Medicare enrollees have two options for obtaining Part D prescription drug coverage: (1) through a MA Plan that offers Part C benefits as well as prescription coverage; or (2) through a separate Medicare Prescription Drug Plan. (*Id.* ¶ 42.) MA Plans that offer Part C benefits generally include prescription drug benefits. (*Id.* ¶ 43.) Plans that provide Part D coverage must provide qualified prescription drug coverage which includes "standard prescription drug coverage" or "alternative prescription drug coverage" with at least actuarially equivalent benefits. (*Id.* ¶ 44.) Part D has different stages of cost sharing until an enrollee reaches a set limit on out-of-pocket

costs for the year.  For example, the limit on out-of-pocket costs for the year 2019, when the Complaint was filed, was $5,100.  (*Id.* ¶ 45.)  After the out-of-pocket limit is reached, the MA Plan pays most of the costs for pharmaceutical products for the remainder of the year.  (*Id.*)

MA Plans may require that a deductible be met prior to paying for pharmaceutical products coverage.  (*Id.* ¶ 46.)  In 2019, the maximum deductible an enrollee could be charged was $ 415. (*Id.*)  During the deductible stage, the enrollee pays all costs for his or her prescriptions.  (*Id.*) Once the deductible is met, the initial coverage period begins.  (*Id.* ¶ 47.)  During this period, the enrollee pays a portion of the pharmacy benefit product's cost and the MA Plan pays the remainder. (*Id.*)  The amount paid by the enrollee will either be a copayment or coinsurance.  (*Id.*)  A copayment is a set amount for all pharmaceutical products based on what tier the pharmacy benefit product falls into on the MA Plan's formulary, and the coinsurance requires an enrollee to pay a percentage of the cost of the pharmacy benefit product.  (*Id.*)

Most Part D plans have a coverage gap known as the "Donut Hole" wherein there is a temporary limit on what the Part D plan will cover.  (*Id.* ¶ 48.)  The coverage gap begins after the enrollee and the MA Plan have paid a certain amount for covered pharmaceutical products.  (*Id.*) For example, in 2019, once the prescription costs reached $3,820, enrollees entered the coverage gap.  (*Id.*)  In the coverage gap, enrollees pay 25% of the price for brand-name pharmaceutical products and MA Plans pay 75%; for generic products, MA Plans pay 63% of the price and enrollees pay 37%.  (*Id.* ¶ 49.)  Once the enrollee and MA Plan have spent $5,100, the enrollee is out of the coverage gap and automatically gets "catastrophic coverage."  (*Id.* ¶ 51.)  Upon the enrollee reaching "catastrophic coverage," he or she only pays their copayment or coinsurance for the remainder of the year.  (*Id.*)

### D.  The Alleged Scheme

Plaintiffs allege that Defendants have conspired with "PBMs" to publicly publish falsely inflated list prices while concealing allegedly lower actual net selling prices of their test strips, resulting in additional revenue for Defendants (the "Scheme").  (Compl. ¶ 5.)  According to Plaintiffs, Defendants have carried out the Scheme by publicly reporting one price—the list price—for their test strips, while secretly offering a lower price—the net price—to the largest PBMs.  (*Id.* ¶ 6.)  Plaintiffs contend that the Scheme has caused third-party payors, including Plaintiffs' Assignors, to overpay for test strips on behalf of their enrollees throughout the United States and, moreover, has increased out-of-pocket costs for their enrollees and the general public.  (*Id.* ¶ 8.)

Critical to Plaintiffs' conspiracy claim is an understanding of the supply chain for pharmaceutical products, like the test strips manufactured by Defendants.  Pharmaceutical products are distributed from manufacturers to wholesale distributors, who then distribute the products to retail or mail-order pharmacies.  (*Id.* ¶ 54.)  In other words, there are three separate transactions made: (1) manufacturer to wholesaler, (2) wholesaler to pharmacy, and (3) pharmacy to consumer.  The price that drug manufacturers, such as Defendants, use to sell to wholesalers is based on the Wholesale Acquisition Cost ("WAC").  (*Id.* ¶ 88.)  The WAC is established by the manufacturer, generally does not include rebates, and is published in compendia compiled by independent third parties.  (*Id.*); *see also* 42 U.S.C. § 1395w-3a(c)(6)(B).[4]  These compendia also

---

[4]    The term "wholesale acquisition cost" is defined by statute as "the manufacturer's list price for the drug or biological to wholesales or direct purchasers in the United States, not including prompt pay or discounts, rebates or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological pricing data."  42 U.S.C. § 1395w-3a(c)(6)(B).

report the Average Wholesale Price ("AWP"), which is commonly used by third-party payors as a basis for reimbursement.[5]  (*Id.* ¶ 89.)  The AWP is calculated by either the manufacturer or the company that publishes the compendia.[6]  (*Id.*)

PBMs serve as middlemen between manufacturers, health insurers, and their enrollees.  (*Id.* ¶ 53.)  Third-party payors contract with, and pay PBMs, to administer their pharmaceutical programs and control pharmacy benefit product costs.  (*Id.* ¶ 65.)  Through these contracts, PBMs are tasked with, among other things, developing formularies[7] for the third-party payors and negotiating with pharmaceutical manufacturers.  (*Id.*)  PBMs currently manage pharmacy benefits for over 266 million Americans, with a few large companies dominating the market.  (*Id.* ¶ 61.)

PBMs generate revenue in three primary ways.  First, their third-party payor clients: (a) pay them service fees for processing prescriptions, and (b) purchase prescription drugs and pharmaceutical products directly through their mail-order pharmacies.  (*Id.* ¶ 55.)  Second, third-

---

[5]    The procedure for setting reimbursement rates for the Medicare program is well established.  For example, in *In re Pharmaceutical Industry Average Wholesale Price Litigation ("AWP I")*, 263 F. Supp. 2d 172, 178 (D. Mass. 2003), the District of Massachusetts explained:

> In setting reimbursement rates, the Medicare program uses the AWPs generated by the pharmaceutical industry.  There are no regulations describing how AWPs are to be calculated, nor any regulatory process for approving them.  Pharmaceutical companies do not report AWPs directly to the federal government, but instead send their price information to independent publishing companies that compile the data and publish the AWPs in trade publications, which are then used by the government, as well as private health plans.  The publishing companies do not independently review the figures for accuracy.  The figures are not filed with the [Center for Medicare and Medicaid Services].

[6]    In their Complaint, Plaintiffs refer to the AWP and the "list price" interchangeably.  I do so here as well.

[7]    A formulary is a list of pharmaceutical products covered by the health plan at various pricing tiers.  (Compl. ¶ 65.)

party payors pay transaction fees on the different operations required to manage the complex cash flows between insurers, pharmacists, and manufacturers.  (*Id.*)  Third, PBMs receive "rebates" and other fees from manufacturers, like Defendants.  (*Id.*)  Plaintiffs allege that "PBMs have the greatest leverage to negotiate lower prices when two or more manufacturers make ostensibly interchangeable products."  (*Id.* ¶ 57.)  In that regard, PBMs enter into contractual relationships with pharmaceutical manufacturers, retail pharmacies, and pharmaceutical wholesalers, and negotiate rebates, fees, and other concessions with these entities.  (*Id.* ¶ 58.)  These relationships, according to Plaintiffs, allow PBMs to exert "tremendous" influence and control over which drugs and pharmaceutical products are made available to health plans and, ultimately, the public.  (*Id.* ¶ 59.)

More specifically, formulary placement is critical to Defendants' business as it results in increased product sales.  (*Id.* ¶ 73.)  Formulary placement corresponds with the amount that a plan participant must contribute as a copayment when purchasing a product—the higher the placement, the lower the copayment, and the higher likelihood that the product will be purchased by plan enrollees in lieu of a more expensive alternative.  (*Id.* ¶ 70.)  Third-party payors provide copies of their formularies to providers, pharmacists, and patients in their network to encourage adherence to the formulary.  (*Id.* ¶ 71.)  Favorable formulary placement will drive demand for a product within the PBM's network of physicians, pharmacists, and participating plans.  (*Id.* ¶ 71–72.)  Indeed, according to Plaintiffs, manufacturers view favorable formulary placement as a guarantee for drug and pharmaceutical product utilization.  (*Id.* ¶ 72.)

Plaintiffs allege that their Assignors rely on PBMs to make impartial formulary decisions based on the cost, safety, and efficacy of a given pharmaceutical product.  (*Id.* ¶ 67.)  Instead, however, Plaintiffs allege that PBMs conspired with Defendants to: (1) provide favorable

formulary placement for the Products on Plaintiffs' Assignors' formularies, and (2) increase the Products' list prices for the sole purpose of providing additional funds to kickback to the PBMs. (*Id.* ¶ 66.)  In other words, Plaintiffs submit, "Defendants and the PBMs discovered that they both benefit if, instead of forcing Defendants to compete on price, Defendants can raise their publicly reported list price, while maintaining nearly constant net prices, thus increasing the spread between the two prices and the resulting rebates to the respective PBM." (*Id.* ¶ 96.)  In that regard, Plaintiffs allege that Defendants and the PBMs have conspired to set three different prices for Defendants' test strip Products: (1) a publicly available AWP (the "list" price), (2) a "discount" price at which the third-party payors using the PBMs will purchase the drugs, and (3) a "net" price that reflects a rebate that the manufacturers will pay to the PBMs.  (*Id.* ¶ 91.)  This scheme, Plaintiffs claim, has caused the AWP for Defendants' Products to increase in lockstep with each other.  (*Id.* ¶ 92.)  That is, the AWPs for Defendants' Products have continued to increase because Defendants are not competing on price but, instead, are competing with each other by paying higher rebates to PBMs in exchange for favorable formulary placement.  (*Id.* ¶ 107.)  The Scheme thus allows PBMs to leverage formulary control for kickbacks while also permitting Defendants to maintain or increase their profit margins by maintaining their sales volume through preferred formulary placement.  (*Id.* ¶ 97.)

Plaintiffs maintain that their Assignors absorb the cost of the higher AWPs and, accordingly, the kickbacks to the PBMs.  (*Id.* ¶ 93.)  More specifically, Plaintiffs allege that their Assignors include the test strip products on their formularies as a result of Defendants' misrepresentations regarding the AWPs for the Products.  (*Id.* ¶ 183.)  In that connection, Plaintiffs maintain that had their Assignors known of the unlawful quid pro quo arrangement, they would not have included the Products on their formularies.  (*Id.*)  Indeed, as a result of the Scheme,

Plaintiffs claim that their Assignors have paid hundreds of million dollars in inflated prices based on the purportedly fraudulent AWPs.  (*Id.* ¶ 180.)

### E.  The Complaint

Plaintiffs filed the Complaint on December 19, 2019.  The Complaint seeks both monetary and injunctive relief pursuant to RICO against all Defendants (Counts I–XII).  The Complaint further asserts state law claims for violations of the following 25 consumer fraud statutes (Count XIII): the Arizona Consumer Fraud Act, Arkansas Deceptive Practices Act, Connecticut Unfair Trade Practices Act, Delaware Consumer Fraud Act, Delaware Uniform Deceptive Trade Practices Act, Florida Deceptive and Unfair Trade Practices Act, Hawaii Unfair or Deceptive Acts and Practices, Idaho Consumer Protection Act, Indiana Deceptive Consumer Sales Act, Massachusetts Regulation of Business Practice & Consumer Protection Act, Michigan Consumer Protection Act, Minnesota Private Attorney General Statute & Consumer Fraud Act, Minnesota Uniform Deceptive Trade Practices Act, Nebraska Consumer Protection Act, Nevada Deceptive Trade Practices Act, New Hampshire Consumer Protection Act, New Mexico Unfair Trade Practices Act, New York General Business Law, North Dakota Unlawful Sales or Advertising Practices Law, Ohio Deceptive Trade Practices Act, Pennsylvania Unfair Trade and Consumer Protection Law, South Carolina Unfair Trade Practices Act, Tennessee Consumer Protection Act, Virginia Consumer Protection Act of 1977, West Virginia Consumer Credit and Protection Act, and Wisconsin Trade Practices Act.  Finally, Plaintiff brings common law fraud and unjust enrichment claims under Illinois and Pennsylvania law (Counts XIV–XVIII).[8]

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure

---

[8]    Plaintiffs have withdrawn their common law claims under New Jersey and Indiana law.

to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three

sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

"Independent of the standard applicable to Rule 12(b)(6) motions," Fed. R. Civ. P. 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (alteration in original) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223–24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* at 200 (citing *Lum*, 361 F.3d at 224). Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 217).

III.      **DISCUSSION**

    **A.  RICO Claims**

Plaintiffs contend that Defendants' alleged Scheme violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), which "makes it unlawful 'for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (citing 18 U.S.C. § 1962(c)).  Plaintiffs' Complaint seeks both treble damages and prospective injunctive relief under RICO.  Defendant, however, moves to dismiss the Complaint on the grounds that (1) Plaintiffs' claims for money damages are barred by the indirect purchaser rule; and (2) RICO does not provide private parties with a cause of action for injunction relief.[9]  I address each type of claim in turn.

    **i.  *The Indirect Purchaser Rule***

Defendants first contend that Plaintiffs' RICO claims for money damages must be dismissed because Plaintiffs, as assignees of third-party payors, are indirect purchasers who lack RICO standing.  While Plaintiffs do not dispute that their Assignors are indirect purchasers, they maintain that the indirect purchaser rule does not bar their RICO claims against Defendants.

The indirect purchaser rule is rooted in the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 744 (1977), in which the Court held that indirect purchasers do not have

---

[9]    Defendants further argue that Plaintiffs have failed to state a claim under RICO.  Because I find, however, that Plaintiffs' are not permitted to proceed with a RICO claim as a matter of law, I need not address the merits of their claim.

standing to proceed with antitrust claims under the Clayton Act.[10]  Specifically, the Supreme Court explained:

> Permitting the use of pass-on theories . . . essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have been absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers.  However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and serious undermine their effectiveness.

*Id.* at 737.  As "antitrust standing principles apply equally to allegations of RICO violations," the Third Circuit has determined that "indirect victims" do not have standing to bring RICO claims. *McCarthy v. Recordex Services Inc.*, 80 F.3d 842, 853–55 (3d Cir. 1996);[11] *see also Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 270–74 (1992) (holding that federal jurisprudence interpreting antirust principles also governs RICO claims).

Plaintiffs do not dispute that they are not direct purchasers of Defendants' test strip products; nor do they dispute that Courts in this District have consistently applied the indirect purchaser rule to RICO claims, including claims identical to those asserted by Plaintiffs here.  (*See*

---

[10]    The Clayton Act creates a private cause of actions for damages suffered as a result of a defendant's violation of the antitrust laws.  *See McCarthy*, 80 F.3d at 856 n.20.

[11]    Plaintiffs argue, without legal support, that the Third Circuit has limited the application of *McCarthy* and that "it has been relegated to its specific factual scenario."  (Pls.' Opp., at 11.)  In support of their position, Plaintiffs point to the Third Circuit's decision in *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 932 (3d Cir. 1999).  There, the Third Circuit considered whether the plaintiff, a health and welfare fund, could hold tobacco companies liable under the antitrust laws and RICO for injuries caused to their beneficiaries.  *Id.* at 918.  In dismissing the plaintiffs' RICO claims, the Third Circuit explained that "much (if not all) of what we have said above in our discussion of antitrust standing applies to the [plaintiffs'] RICO claims." 171 F.3d at 932.  The Court, however, briefly discussed "the specific requirements for stating a claim under RICO, to better explicate our reasons for finding that all of plaintiffs' claims must fail for being too remote and speculative."  *Id.* at 932.  That discussion, however, did not undermine the court's holding in *McCarthy* and, rather, simply provided a more detailed discussion as to why plaintiffs could not maintain a RICO claim against the tobacco companies.

Pls.' Opp., at 7–8.)  For example, in *MSP Recovery Claims Series, LLC v. Sanofi-Aventis U.S. LLC ("Sanofi I")*, the same plaintiffs in this action, asserted RICO claims against manufacturers and developers of insulin products.  No. 18-2211, 2019 WL 1418129, at *2 (D.N.J. Mar. 29, 2019).  As here, the *Sanofi I* plaintiffs had been assigned recovery rights for various MA Plans.  *Id.*  The *Sanofi I* court dismissed plaintiffs' RICO claims, reasoning that plaintiffs were "multiple purchasers down the distribution chain from Defendants and are quintessential indirect purchasers for the purposes of the indirect purchaser rule."  *Id.* at *14.  Other courts in this District have repeatedly dismissed RICO claims where the plaintiffs were indirect purchasers.  *See, e.g.*, *Minnesota ex rel. Ellison v. Sanofi-Aventis*, No. 18-14999, 2020 WL 2394155, at *9 (D.N.J. Mar. 31, 2020); *In re Insulin Pricing Litig.*, 17-0699, 2019 WL 643709, at *13 (D.N.J. Feb. 15, 2019); *see also Hu v. BMW of N. Amer., LLC*, No. 18-4363, 2021 WL 1138123, at *3–4 (D.N.J. Mar. 24, 2021) (collecting cases); *Hale v. Stryker Orthopaedics*, No. 08-3367, 2009 WL 321579, at *2–3 (D.N.J. Feb. 9, 2009).  Plaintiffs make no attempt to distinguish these cases.

Seeking a different result, Plaintiffs argue that this matter is akin to *Avandia Marketing Sales Practices & Products Liability Litigation*, 804 F.3d 633 (3d Cir. 2015).  In *Avandia*, third-party payors brought claims against the manufacturers of Avandia based on the manufacturers' alleged misrepresentation and concealment of serious health risks associated with use of the Avandia family of products.  *Id.* at 634–36.  On appeal, the Third Circuit held that the third-party payor plaintiffs there were permitted to bring RICO claims against pharmaceutical manufacturers because they included Avandia on its formulary based on the fraudulent acts of the manufacturer.  *Id.* at 645.  Plaintiffs contend that *Avandia* is "strikingly similar" to the case at bar because Plaintiffs assert the same harm as the *Avandia* plaintiffs, *i.e.*, "Plaintiffs' Assignors included the test strip products on their formularies at favorable tier levels based on Defendants' fraudulent

acts."  (Pls.' Opp., at 8.)

Plaintiffs attempted this exact line of argument in *Sanofi I*, and it was rejected by the court:

> Unlike here, the *Avandia* plaintiffs were not seeking recourse pursuant to payments made to third parties based on allegedly fraudulent prices set by a manufacturer.  Rather, the *Avandia* plaintiffs' cause of action was couched in the defendants' alleged failure to disclose known health risks of various drugs ultimately included in formularies.

*Sanofi I*, 2019 WL 1418129, at *15.  I agree with that court's analysis.  The Third Circuit, in holding that the *Avandia* plaintiffs were permitted to proceed with RICO claims, explained

> The conduct that allegedly caused plaintiffs' injuries is the same conduct forming the basis of the RICO scheme alleged in the complaint—the misrepresentation of the heart-related risks of taking Avandia that caused [third-party payors] and PBMs to place Avandia in the formulary.  The injury alleged by the [third-party payors] is an economic injury independent of any physical injury suffered by the Avandia users.  And, as far as we can tell, prescribing physicians did not suffer RICO injury from [the] marketing of Avandia.

*Avandia*, 804 F.3d at 644.  In other words, in *Avandia*, the TPP plaintiffs directly relied on the manufacturer's misrepresentations regarding the safety of the Avandia products in making their formulary decisions.  *See id.*; *see also In re Insulin Pricing Litig.*, 2019 WL 643709, at *9 ("The *Avandia* plaintiffs were third-party payors who included the product, Avandia, in their formulary decisions at favorable rates in direct reliance on material misrepresentations made by the defendant, a pharmaceutical company.").  Here, however, Plaintiffs allege that their Assignors made "inflated payments" for Defendants' test strip products because the PBMs did not disclose the full extent of the rebates they received while acting on behalf of the Assignors.  (*See* Compl. ¶ 180.)  This injury is too far downstream from the conduct of Defendants for Plaintiffs to proceed with a RICO claim.  *See In re Insulin Pricing Litig.*, 2019 WL 643709, at *9; *Sanofi I*, 2019 WL 1418129, at *15.  Accordingly, Plaintiffs RICO claims are dismissed as barred by the indirect

purchaser rule.[12]

## ii. *Injunctive Relief Under RICO*

Defendants additionally argue that Plaintiffs' RICO claims for injunctive relief are also barred as a matter of law. Neither the Supreme Court nor the Third Circuit have considered whether equitable relief is available to private parties under RICO. *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2111 n.13 (2016) ("This Court has never decided whether equitable relief is available to private RICO plaintiffs, the parties have not litigated that question here, and we express no opinion on the issue today."); *Steamfitters*, 171 F.3d at 935 n.20 ("This court has yet to decide whether injunctive relief is available for a private party under RICO."). The Courts of Appeals that have considered this question are split on its resolution. *Compare Chevron Corp. v. Donziger*, 833 F.3d 74, 137 (2d Cir. 2016) (concluding that "a federal court is authorized to grant equitable relief to a private plaintiff who has proven injury to its business or property by reason of a defendant's violation of § 1962"); *and Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 695 (7th Cir. 2001) (holding that "the text of the RICO statute, understood in the proper light, itself authorizes private parties to seek injunctive relief"), *rev'd on other grounds*, 537 U.S. 393 (2003); *with Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088 (9th Cir. 1986) ("Taken together, the legislative history and statutory language suggest overwhelmingly that no private equitable action should be implied under civil RICO.").

Several courts in this District have determined that private parties cannot obtain equitable relief under RICO. *See, e.g.*, *Minnesota ex rel. Ellison*, 2020 WL 2394155, at *11–12 (holding "that a private party may not seek equitable relief under RICO"); *MSP Claims Recovery Series,*

---

[12]     Plaintiffs' claims for conspiracy under RICO rise and fall with their claims under section 1962(a). Accordingly, the RICO conspiracy claims are dismissed for the same reasons as set forth above.

*LLC v. Sanofi-Aventis U.S. LLC ("Sanofi II")*, No. 18-2211, 2020 WL 831578, at *7–8 (D.N.J. Feb. 20, 2020); *Futterknecht v. Thurber*, No. 14-7395, 2015 WL 4603010, at *4 (D.N.J. July 30, 2015) ("[T]he Court notes that the federal RICO statutes do not provide a private right of action for injunctive relief."); *Johnston Dev. Grp., Inc. v. Carpenters Local No. 1578*, 728 F. Supp. 1142, 1146 (D.N.J. 1990) (observing that RICO "makes no provision for private equitable relief"); *Curley v. Cumberland Farms Dairy, Inc.*, 728 F. Supp. 1123, 1137–38 (D.N.J. 1989). *Curley*, one of the first cases in this District to consider the issue, relied on the Ninth Circuit's decision in *Wollersheim* and, following an examination of the statutory language of section 1964(c) and the relevant legislative history, declined to "set out on an uncharted path," and concluded that RICO does not provide an equitable remedy to private parties. 728 F. Supp. at 1137–38. Nevertheless, Plaintiffs urge this Court to disregard these authorities and, instead, follow the Second and Seventh Circuits and hold that private parties may seek equitable relief under RICO.

I decline to stray from the reasoned decisions from this District. Moreover, Plaintiffs point to no case in this District that has adopted the reasoning of the Second and Seventh Circuits. Further, I need not wade into this legal quagmire as, even under the Second and Seventh Circuit's interpretation of section 1964, a private plaintiff must still prove a violation of section 1962 to obtain equitable relief. *See Chevron Corp.*, 833 F.3d at 140 ("We conclude that a federal court is authorized to grant equitable relief to a private plaintiff who has proven injury to its business or property by reason of a defendant's violation of § 1962."); *see also Aliperio v. Bank of Am., N.A.*, No. 16-1008, 2016 WL 7229114, at *15 n.16 (D.N.J. Dec. 13, 2016) (dismissing claim for injunctive relief under RICO where plaintiff lacked Article III standing to bring a claim under § 1962. As set forth above, Plaintiffs, as indirect purchasers, cannot proceed with a RICO claim against Defendants under section 1962. It follows, therefore, that Plaintiffs are similarly unable to

seek equitable relief for the alleged RICO violations.  Accordingly, Plaintiffs' claims for injunctive relief under § 1964 are dismissed.

### B.  State Law Claims[13]

#### i.  Assignment

Defendants move to dismiss several of Plaintiffs' state law claims on the grounds that they cannot be assigned under state law.  (Defs.' Br., at 59–60.)  Specifically, Defendants argue that Plaintiffs' claims are not assignable under the laws of Arizona, Arkansas, Connecticut, Delaware, Michigan, Nevada, New Mexico, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia, as these states do not permit the assignment of tort claims generally, or fraud claims specifically.  (*Id.*)  Further, Defendants contend that Plaintiffs' claims cannot be assigned pursuant to the champerty laws of Delaware, New York, Ohio, and Pennsylvania, which prohibit the assignment of claims to parties who have no connection to the litigation independent of the assignment under which the litigation was brought.  (*Id.*)  Defendants make these arguments in conclusory fashion and, in their moving brief, include only two sentences with string citations to cases which apparently set forth each State's law of assignment, without any analysis.  I, nevertheless, briefly address the parties' arguments in this regard.

I begin with whether the assignment of claims to Plaintiffs was valid under the laws of the following states: Arizona, Arkansas, Connecticut, Delaware, Michigan, Nevada, New Mexico, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.  With the exception of Pennsylvania, each of Plaintiffs' claims brought under the above-referenced state laws are under the states' consumer protection and/or deceptive trade statutes.  Defendants posit that because

---

[13]    The Court has jurisdiction over the state law claims based on the diversity of citizenship of the parties.  *See* 28 U.S.C. § 1332(a).

these claims are, at their essence, tort claims that sound in fraud, they cannot be assigned under the laws of these states. Plaintiffs, however, argue that their claims are purely statutory in nature and, even if considered tort claims, can be validly assigned under state law.

I decline to dismiss Plaintiffs' claims under Arizona, Arkansas, Connecticut, Delaware, Michigan, Nevada, New Mexico, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia law on this ground. Plainly, the parties' briefing on this issue is inadequate. For example, Defendants place the majority of their argument on the question of assignability in footnotes with long string citations to cases, which they contend, demonstrate that claims sounding in fraud are not assignable. (*See* Moving Br. at 60 n.20.) The Court's review of these cases, however, reveals that the analysis is not so clear cut, especially where the claims arise under the state's consumer protection statutes. For example, Defendants contend that the Connecticut Supreme Court, in *Stearns & Wheeler, LLC v. Kowalsky Bros., Inc.*, 955 A.2d 538 (Conn. 2008), determined that claims under the Connecticut Unfair Trade Practices Act ("CUPTA") are not assignable. (*See* Defs.' Reply, at 23 n.9.) Plaintiffs similarly contend that *Stearns & Wheeler*, supports their position that their assignment is enforceable under Connecticut law. *Stearns & Wheeler*, however, does not have the weight the parties ascribe to it. Rather, the *Stearns & Wheeler* court declined to reach the issue of whether CUPTA claims are generally not assignable. 955 A.2d at 543 n.12. The court determined that the assignment at issue was invalid because, if the assignment were enforced, it "would undermine the well-defined legislative policy limiting remedies against employers and would effectively circumvent the workers' compensation exclusivity provision." *Id.* at 544. In that regard, the *Stearns & Wheeler* decision demonstrates that the determination of whether a claim can be assigned under a state's consumer protection statute involves important issues of state public policy.

21

Given that the determination of whether assignment is permitted under state law involves important policy concerns as they relate to each specific state, I decline to address this argument at this time. Defendants' cursory treatment of this argument is akin to an afterthought and both parties have failed to adequately address the nuances of whether the assignment of these claims is valid under the law of each state in question. Accordingly, Defendants' motion to dismiss is denied on this ground.

Next, Defendants argue that Plaintiffs' claims are prohibited by the champerty laws of Delaware, New York, Ohio and Pennsylvania. Plaintiffs argue, however, that (1) under New York law, champertous intent is a fact-sensitive inquiry that cannot be addressed on a motion to dismiss, and (2) that its assignments do not run afoul of the doctrine of champerty under Delaware, Ohio, and Pennsylvania law. At its core, "the champerty doctrine invalidates an assignment of claims where, *inter alia*, the assignee has no interest in the suit *but for* the assignment." *Riffin v. Consolidated Rail Corp.*, 363 F. Supp. 3d 569, 575–76 (E.D. Pa. 2019).

New York's champerty law is set forth by statute and provides that "[n]o corporation or association, directly or indirectly . . . shall solicit, buy or take assignment . . . of any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon." N.Y. Judiciary Law § 489. "Under New York law, a defendant asserting the affirmative defense of champerty must demonstrate that the plaintiff acquired the claim for the 'sole' or 'primary' purpose of bringing suit." *Elliott Assocs., L.P. v. Republic of Peru*, 948 F. Supp. 1203, 1209 (S.D.N.Y. 1996) (quoting *CIBC Bank & Trust Co. v. Banco Central do Brasil*, 886 F. Supp. 1105, 1110 (S.D.N.Y. 1995)). Importantly, a court's analysis of champertous intent is fact-intensive that is inappropriate for resolution on a motion to dismiss. *See id.*; *see Sanofi I*, 2019 WL 1418129, at *8 (determining that, under New York law, "the issue of champertous intent may not be

adjudicated at the motion to dismiss stage"). As such, it is premature to assess champertous intent.

However, courts have addressed champertous intent at the motion to dismiss stage in Ohio, Delaware, and Pennsylvania. *See Hiles v. NovaStar Mortg., Inc.*, No. 12-392, 2012 WL 4813775, at *6 (S.D. Ohio Oct. 10, 2012) (finding assignment void on Rule 12(b)(6) motion).

Under Ohio law, "[c]hamperty is 'a form of maintenance in which a nonparty undertakes to further another's interest in a suit in exchange for a part of the litigated matter if a favorable result ensures." *Id.* at *4 (quoting *Rancman v. Interim Settlement Funding Corp.*, 789 N.E.2d 217, 219 (Ohio 2003)). "Importantly, to bar a suit on the grounds of champerty under Ohio law, a court must be persuaded that the assignee either has 'no bona fide interest in the case' or would 'receive a stake in the assignors' claims." *Sanofi I*, 2019 WL 1418129, at *9 (citing *Hiles*, 2012 WL 4813775, at *4). Similarly, under Delaware law, "[t]he doctrines of champerty and maintenance apply only to 'volunteers' or 'strangers'—those who have no legal interest in the subject matter of the dispute; those who have no relation to either of the parties to the dispute; and those who are not acting in the lawful exercise of their profession as counsel to one of the parties." *Hall v. Delaware*, 655 A.2d 827, 829 (Del. Super. Ct. 1994). Moreover, "Pennsylvania's champerty doctrine invalidates an assignment of claims 'when the party involved: (1) has no legitimate interest in the suit, but for the agreement; (2) expends his own money in prosecuting the suit; and (3) is entitled by the bargain to share in the proceeds of that suit." *Riffin.*, 363 F. Supp. 3d at 576. The case law makes clear that to evaluate champertous intent, specific facts matter.

At this time, I find that dismissal of Plaintiffs' claims under the laws of champerty is premature. There are no facts presented that demonstrate that Plaintiffs would "receive a stake" in the Assignors claim and Plaintiffs have, at least, alleged a bona fide and legal interest in the case—"they were assigned the claims due in part to the assignors' difficulty in identifying causes

of action." *See Sanofi I*, 2019 WL 1418129, at *9.  Therefore, at this juncture and without more facts, I cannot find that the assignments are void under the laws of New York, Ohio, Delaware, or Pennsylvania.

### ii.  Common Law Fraud Claims

In the Complaint, Plaintiffs assert common law fraud claims against the Abbott Defendants pursuant to Illinois law (Count XVI), and LifeScan pursuant to Pennsylvania law (Count XVII). Before addressing these arguments, I note, again, that the parties' briefing on Plaintiffs' common law fraud claims is rather conclusory.  Indeed, Defendants seem to view these claims as an adjunct to Plaintiffs' RICO claims and simply refer the Court to their arguments on the merits of Plaintiffs' RICO claims.  (*See* Moving Br., at 51.)  In that regard, Defendants argue that the common law fraud claims should be dismissed because (1) Plaintiffs have not alleged that Defendants' wholesale prices are fraudulent, (2) Plaintiffs do not identify any known legal duty to disclose that would render Defendants' wholesale prices misleading, and (3) Plaintiffs do not allege, with particularity, a scheme to defraud.  Defendants further argue that Plaintiffs have failed to show proximate causation.

To state a claim of common law fraud under Illinois and Pennsylvania law, a plaintiff must allege "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996) (setting forth law of both Illinois and Pennsylvania); *see also Ellis v. Allstate Ins. Co.*, 479 F. Supp. 2d 782, 789 (N.D. Ill. 2006) (Illinois); *Kornea v. J.S.D. Mgmt., Inc.*, 366 F. Supp. 3d 660, 672 (E.D. Pa. 2019) (Pennsylvania).  Rule 9(b)'s particularity requirements apply with equal force to actions that are

24

based on state law but brought in federal court. *Frederico*, 507 F.3d at 200.

### 1. *Whether Defendants Misrepresented the AWPs for their Test Strip Products*

Defendants first argue that Plaintiffs have not sufficiently alleged that Defendants' wholesale list prices, *i.e.*, the AWP, are fraudulent.[14] In that connection, Defendants maintain that Plaintiffs' fraud allegations are implausible because the Complaint "does not allege that Defendants hold out their wholesale prices as reflecting PBM rebates." (Moving Br., at 32.) Plaintiffs, however, allege that Defendants misrepresented their list prices by holding out the prices as reasonable benchmarks for reimbursement when they knew that they were inflated and not, in fact, a reasonable basis for reimbursement.

I begin with a brief summary of allegations made in the Complaint in support of the common law fraud claims. Plaintiffs allege that:

> Defendants knowingly and affirmatively misrepresented and/or concealed and suppressed material facts concerning the following: (1) the true cost and/or price of the Products described herein; (b) the inflated and/or fraudulent nature of the list price(s) set and/or charged by Defendants for the Products described herein; (c) the existence, amount, and/or purpose(s) of discounts and/or rebates (kickbacks) offered and/or negotiated by Defendants for those products; and (d) the role that Defendants played in the price paid for the Products described herein, including but not limited to marketing material averring that Defendants decrease the price of pharmaceutical products for consumers, including Plaintiffs.

---

[14]    At the outset, Defendants assert that Plaintiffs alleges that the wholesale acquisition cost should include PBM rebates. (Moving Br., at 31.) However, this assertion oversimplifies Plaintiffs' position. Plaintiffs' theory of fraud centers on their allegation that Defendants knowingly made material misrepresentations to Plaintiffs' Assignors and the general public that "the test strip AWPs served as a reasonable reimbursement benchmark and that the AWPs were a fair basis on which to base payments from TPPs." (Pls.' Opp. Br., at 18.) That is, Plaintiffs allege that the AWPs published by Defendants in the pricing compendia were not "real reference prices" but, rather, "fictitious . . . AWPs based on the spread size they intended to offer to the largest PBMs rather than their true prices." (*Id.* at 18–19.)

(Compl. ¶¶ 616, 639.)  In other words, Plaintiffs allege that Defendants knowingly made material misrepresentations to the general public by stating that the test strip AWPs, which Plaintiffs alleged were artificially inflated to cover the costs of the rebates paid to PBMs, served as a reasonable reimbursement benchmark and that the AWPs were a fair basis on which to base payments from third-party payors.  (*See id.* ¶¶ 141, 148, 167.)

I find that these allegations are sufficient to support Plaintiff's theory that the list prices for Defendants' products are fraudulent misrepresentations.  Plaintiffs allege that by setting a certain price, Defendants made material representations to the public that the test strip AWPs were a fair basis on which to base payments from third-party payors and that, rather than publish real reference prices, Defendants contrived fictitious AWPs based on the spread size they intended to offer the largest PBMs.[15]  (*See* Compl. ¶¶ 6, 91, 141, 171, 167.)  Courts, including the Commonwealth Court of Pennsylvania, have determined that such conduct on the part of drug manufacturers may constitute a material misrepresentation to support a common law fraud claim.  *See, e.g., Commonwealth ex rel. Pappert v. TAP Pharm. Prods., Inc. ("TAP")*, 885 A.2d 1127, 1138 (Pa.

---

[15]     To the extent Defendants rely on the Third Circuit's decision in *Lum v. Bank of America*, 361 F.3d 217, 223 (3d Cir. 2004), to support dismissal of Plaintiffs' common law fraud claims, that reliance is misplaced.  *Lum* involved a RICO claim brought against banks by borrowers who alleged that the banks had engaged in fraud by advertising a "prime rate."  *Id.* at 225.  The *Lum* plaintiffs alleged that because the term "prime rate" did not refer to the lowest rate the banks offered to any customer, it was fraudulent.  *Id.*  The Third Circuit upheld the district court's dismissal of Plaintiffs' RICO claim, because the complaint did not allege "that any of the three purportedly fraudulent credit agreements define the term 'prime rate' as the lowest interest rate available to a bank's most creditworthy borrowers."  *Id.*  In that regard, the *Lum* court noted that "the meaning of the term 'prime rate' is sufficiently indefinite that it is reasonable for the parties to have different understandings of its meaning."  *Id.* at 226.  As such it was "unreasonable to infer that defendants' use of the equivocal term 'prime rate' was reasonably calculated to deceive persons of ordinary prudence and comprehension into believing that no borrower obtained an interest rate below the prime rate."  *Id.*  Unlike in *Lum*, however, Plaintiffs' allegations do not rest on an arguably vague pricing term.  Rather, Plaintiffs contend that Defendants misrepresented their AWPs and continued to hold out the prices are reasonable benchmarks for reimbursement when they knew otherwise.

Commw. Ct. 2005); *see also Harris Cty., Texas v. Eli Lilly & Co.*, No 19-4994, 2020 WL 5803483, at *16 (S.D. Tex. Sept. 29, 2020) (finding that plaintiffs stated a claim for common law fraud under Texas law where plaintiff alleged "that the Manufacturer Defendants worked with the PBM Defendants in a coordinated effort to artificially inflate reported prices for diabetes medications and then publish those artificially inflated prices in a *quid pro quo* of money for preferred placement on formulary lists"); *Sanofi I*, 2019 WL 1418129, at *19 (holding that plaintiffs had adequately pled common-law fraud claim under New Jersey law where they alleged that drug manufacturer defendants had engaged in "material, factual misrepresentations" by publishing intentionally inflated prices for insulin); *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 167–68, 181–82 (D. Mass. 2003).

For example, in *TAP*, the Attorney General of Pennsylvania, as *parens patriae*, alleged that the defendant drug manufacturer inflated the self-reported AWP for its products "for inclusion in a pharmaceutical publication upon which the Commonwealth relied."  885 A.2d at 1132.  Similar to the allegations here, the plaintiff in that case alleged that this scheme was maintained to create a spread between the AWP and the reduced price paid by the pharmacy.  *Id.* at 1132–33.  This practice, plaintiff alleged, "create[d] an incentive for the pharmacy to select certain drugs and thereby results in a greater market share for the Defendants' products."  *Id.*  The *TAP* court determined that the Commonwealth stated a claim for common law fraud because it alleged "that, in reporting the AWPs to the publishing compendia, the Defendants were making representations that these figures reflected real, fact-based average wholesale prices."  *Id.* at 1138.

Defendants attempt to distinguish these cases by submitting that, for example, *Sanofi I* and

*Lupron*, involved drugs, the prices of which are federally regulated.[16] (Defs.' Reply, at 12.) While Defendants are correct that drug manufacturers are federally required to report "the average price that wholesalers pay for each drug, accounting for any discounts, which is known as the Average Manufacturing Price," *In re Insulin Pricing*, 2019 WL 643709, at *2, these cases did not involve allegations that the manufacturer defendants inflated the *average manufacturing price* that they are required to report to federal regulators.  Rather, those cases involved allegations, similar to here, that the drug manufacturer defendants artificially inflated the list prices, *i.e.*, the AWPs, that appeared in industry publications compiling wholesale drug prices.  *See Sanofi I*, 2019 WL 1418129, at *3–4; *In re Insulin Pricing*, 2019 WL 643709, at *2 ("Plaintiffs further maintain that some insurers have elected not to pass on manufacturer rebates to consumers, and that as a result, the benchmark price [(the AWP)] is fraudulent because it does not account for manufacturer rebates payments made to PBMs."); *Lupron*, 295 F. Supp. 2d at 159 (noting that the AWP for Lupron was provided to the industry compendia by the manufacturer and was not independently verified either by Health and Human Services or the compendia's publishers).  As these cases involved allegations that drug manufacturers artificially inflated the list prices for their respective products, they are relevant to this Court's discussion of whether Defendants, here, made material misrepresentations in publishing allegedly artificially inflated AWPs.

Defendants additionally contend that, to the extent Plaintiffs' claims are based on an alleged failure to disclose the entirety of their rebates with PBMs, they also fail.  This argument

---

[16] In a similar vein, Defendants argue that Plaintiffs' fraud claim fails because "[t]he Complaint asserts, without citation, that Defendants' wholesale prices do not comply with a federal regulation supposedly governing how they must be calculated and reported to the federal government."  (Moving Br., at 33.)  I agree that Plaintiffs have failed to indicate any federal regulation with which Defendants have failed to comply.  However, this failure is immaterial because, as set forth above, I find that Plaintiffs sufficiently pleaded that Defendants fraudulently misrepresented their AWPs in other ways.

misses the mark.  It is axiomatic that "[m]ere silence about even material information is not fraudulent absent a duty to speak." *Stran-sky v. Cummins Engine Co., Inc.*, 716 F.3d 705, 728–29 (7th Cir. 1995); *see also TAP*, 885 A.2d at 1138 (noting that, under Pennsylvania law, "plaintiffs who base a claim of fraud on a non-disclosure must plead facts showing that the defendant had a duty to disclose"); *Check v. Clifford Chrysler-Plymouth of Buffalo Grove, Inc.*, 794 N.E.2d 829, 835 (Ill. App. Ct. 2003) ("Fraud may also be based on the omission or concealment of a material fact if accompanied by the intent to deceive under the circumstances which create the opportunity and duty to speak.").  This is not, however, a case involving a failure to disclose information. Rather, Plaintiffs allege that Defendants affirmatively misrepresented their AWPs as benchmark prices when they were not.  Courts have consistently determined that "the act of publishing artificially inflated prices itself can constitute a fraudulent statement." *Harris County*, 2020 WL 5803483, at *16; *Sanofi I*, 2019 WL 1418129, at *19 (finding that plaintiffs sufficiently pleaded claim for common law fraud where they alleged that defendants had engaged in "material factual misrepresentations" by publishing inflated prices for insulin); *Lupron*, 295 F. Supp. 2d at 167 ("[D]efendants trumpeted a lie by publishing the inflated [prices], knowing (and intending) them to be used as instruments of fraud.").  Accordingly, I find that Plaintiffs have sufficiently alleged a misrepresentation under Pennsylvania and Illinois law.

### 2.  *Proximate Causation*

Defendants additionally argue that Plaintiffs have failed to plead a plausible theory of proximate causation.  Both Pennsylvania and Illinois law require that a plaintiff "establish damage as a proximate result of misrepresentation." *McCabe v. Ernst & Young, LLP*, No. 01-5747, 2006 WL 42371, at *13 (D.N.J. Jan 6., 2006) (applying Pennsylvania law); *see also Phillips v. DePaul Univ.*, 19 N.E.3d 1019, 1036 (Ill. App. Ct. 2014) (requiring plaintiffs allege proximate cause in

support of common law fraud claim). Specifically, Defendants argue that Plaintiffs cannot plead a direct relationship between their alleged injuries and Defendants' conduct because between the Assignors and Defendants "are PBMs, wholesalers, pharmacies, and consumers." (Reply Br., at 17.) In that regard, Defendants maintain that Plaintiffs' theory of injury concerns "cost pass-throughs," but, according to Defendants, "the Complaint is devoid of allegations about how costs are passed down the distribution chain." (Moving Br., at 46.)

Although Plaintiffs assert that the costs of the inflated AWPs were passed down to them, they further allege that "[b]ut for the misrepresentations that Defendants made regarding the [AWPs] of their Products and the Scheme that the Manufacturer-PBM Test Strip Pricing Enterprises employed, Plaintiffs' Assignors would have refused to include the Defendants['] on their formularies, or would have paid less for their Enrollee's Products." (Compl. ¶ 183.) These allegations are sufficient to plead proximate causation because Plaintiffs contend that the alleged injuries suffered by Plaintiffs' Assignors, *i.e.*, the overpayment for the test strip products, would not have occurred but for Defendants conduct. *See, e.g.*, *Harris Cty, Texas*, 2020 WL 5803483, at *11; *see also In re Insulin Pricing Litig.*, 2019 WL 643709 (finding that plaintiffs sufficiently pleaded proximate causation where they alleged that "their injuries would not have occurred '[b]ut for the misrepresentations that the Defendant Drug Manufacturers made regarding the benchmark prices of their analog insulins'"); *Lupron*, 295 F. Supp. 2d at 175 ("Plaintiffs' allegations that as a result of the Lupron marketing scheme they were induced to make many millions of dollars in overpayments for the drug is more than sufficient to satisfy RICO's causation requirement at the pleading stage.").[17]

---

[17]    Defendants additionally argue that Plaintiffs have not shown proximate cause because "their Assignors knew the relevant facts before entering into the transactions at issue." (Moving Br., at 47–48.) In that connection, Defendants contend that the Assignors knew that Defendants

Moreover, the Court does not find that that intermediaries between Plaintiffs' Assignors and Defendants, *i.e.*, pharmacies, PBMs, patients, and physicians, break the chain of causation. In that regard, I find the Ninth Circuit's analysis of whether intermediaries, such as PBMs and prescribing physicians, break the chain of causation persuasive:

> If we were to hold the opposite—that prescribing physicians' and pharmacy benefit managers' decisions constitute an intervening cause to sever the chain of proximate cause—as the Second and Seventh Circuits have held, drug manufacturers would be insulated from liability for their fraudulent marketing schemes, as they could continuously hide behind prescribing physicians and pharmacy benefit managers. That is not the purpose the requirement of proximate cause is intended to serve. Proximate cause exists to "limit a person's responsibility for the consequences of that person's own acts." Here, Plaintiffs seek to hold Defendants liable for the consequences of their own acts and omissions toward Plaintiffs: the money spent by Plaintiffs to purchase Actos.

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1257–58 (9th Cir. 2019) (quoting *Holmes*, 503 U.S. at 268). Similarly, here, Defendants cannot escape the consequences of their actions by hiding behind intermediaries. Plaintiffs allege that Defendants' inflated the AWPs for their test strip products to cover the spread of the rebates paid to PBMs. In inflating their AWPs in this way, Defendants knew, based on the structure of the American health care system, that third-party payors, like Plaintiffs' Assignors, would pay out pharmacy claims based on those AWPs. *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 38 (1st Cir. 2013) ("In fact, the causal chain in this case is anything but attenuated. Pfizer has always known that, because of the structure of the American health care

---

were paying rebates to the PBMs and that knowledge breaks any chain of causation. I decline to grant Defendants' motion on this ground as resolution of the question of whether the Assignors had knowledge of the Scheme, and whether that breaks the chain of causation, is a question of fact that cannot be resolved on a motion to dismiss. *See TAP*, 885 A.2d at 1139 (noting that question of whether plaintiff should have known the AWP was not reliable "requires further factual exploration").

system, physicians would not be the ones paying for the drugs they prescribed. Pfizer's fraudulent marketing plan, meant to increase its revenues and profits, only became successful once Pfizer received payments for the additional Neurontin prescriptions it induced. Those payments came from Kaiser and other TPPs."). Accordingly, I find that Plaintiffs have sufficiently alleged proximate causation.

### 3. Remaining Elements of Common Law Fraud

Having found that Plaintiffs have alleged, with particularity, material misrepresentations and proximate causation, I turn to the remaining elements of common law fraud. Plaintiffs have adequately alleged that Defendants' knew their AWPs did not accurately reflect the actual cost of the test strips, (Compl. ¶¶ 76, 108–17, 141–48), and that Defendants intended for third-party payors to rely on the fraudulent prices. (*Id.* ¶¶ 77–78, 149, 167). Moreover, I find that Plaintiffs have sufficiently alleged that their Assignors relied on Defendants' allegedly misleading statements. Plaintiffs make the following allegations regarding reliance:

> Plaintiffs Assignors rightfully relied on the fraudulent list prices published by Defendants when determining whether the PBMs should be permitted to place the Products on their formularies.
>
> . . .
>
> Plaintiffs' Assignors allowed the PBMs to include the Products on their formularies, and placed favorably, based on Defendants' and their PBM Co-Conspirators' misrepresentations that the Products were cost effective. But for Defendants' and their PBM Co-Conspirators' fraudulent conduct, Plaintiffs' Assignors would have excluded the Products from their formularies.

(Compl. ¶¶ 79–80; *see also id.* ¶¶ 620 ("Plaintiffs' Assignors reasonably relied on Defendants' deception, and Defendants intended that they would do so.").) These allegations are sufficient to plead reliance. *See Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 526 (D.N.J. 2008) ("Plaintiff alleges reliance only generally, but such general allegations of reliance are sufficient in light of the

fact that the specific facts as to the misrepresentations are within Defendants' control, not Plaintiff's."); *see also Sanofi I*, 2019 WL 1418129, at *19 (finding that plaintiffs adequately pleaded reliance where "the Amended Complaint pled a fraudulent pricing scheme by virtue of misrepresentations of list prices, on which Defendants had reason to know that the public – and any consumer of their insulin–would rely"); *TAP*, 885 A.2d at 1138–39.  Finally, Plaintiffs allege damages stemming from their reliance, namely that the Defendants' conduct caused Plaintiffs' Assignors to make "inflated payments for the Products in reliance on the falsely inflated list prices."  (*See* Compl. ¶ 181.)

Accordingly, Defendants' motion to dismiss Plaintiffs' common law fraud claims under Pennsylvania and Illinois law is denied.

### iii.  Consumer Protection Claims

Defendants additionally move to dismiss Plaintiffs' claims under to various state consumer protection laws.  Plaintiffs assert claims under the consumer protection and/or deceptive trade protection laws of 24 states.  In broad-brush fashion, Defendants argue that all of these claims must be dismissed because Plaintiffs do not allege "a scheme to defraud," nor have they adequately alleged proximate causation, both of which are required to maintain a claim under each state's laws.  (*See* Moving Br., at 52, 55.)  As set forth above, however, I find that Plaintiffs have sufficiently alleged that Defendants made fraudulent misrepresentations regarding the accuracy of their published AWPs.  Plaintiffs' consumer protection claims are based on the same alleged scheme to defraud.  Similarly, I have determined that Plaintiffs have sufficiently alleged proximate causation.  Notably, Defendants do not set forth detailed reasons that dismissal is warranted for the majority of Plaintiffs' state specific consumer protection claims.  Rather, Defendants rely on the same general arguments as with the common law fraud claims.  Aside from rejecting

Defendants' argument in this context, I will not conduct an independent review into the merits of each of these claims. It is incumbent on Defendants to raise issues with Plaintiffs' Complaint in their moving papers. The Court will not act as advocate and determine, *sua sponte*, whether Plaintiffs have, in fact, alleged every element of each state's consumer protection law. Rather, having rejected Defendants' basis for dismissal of the claims, at this stage, I find that Plaintiffs have, generally, stated consumer protection claims under the laws of Arkansas, Connecticut, Delaware, Florida, Indiana, Minnesota, Nebraska, New Hampshire, New Mexico, North Dakota, Ohio, South Carolina, and Tennessee.

Defendants do, however, make specific arguments as to why Plaintiffs have failed to state a claim under the laws of Arizona, Hawaii, Idaho, Massachusetts, Michigan, Nevada, New York, Virginia, West Virginia, and Wisconsin. Specifically, Defendants argue that these claims fail because (1) Plaintiffs are not consumers, nor are their claims consumer-related, as required by the Consumer Protection laws of Hawaii, Michigan, New York, Virginia, West Virginia, and Wisconsin, (2) they do not allege a direct link between their Assignors and Defendants' alleged misrepresentations as required by the laws of Arizona, Idaho, and Massachusetts, and (3) they have not pleaded justifiable reliance as required by Michigan, Nevada, and Pennsylvania law.

### 1. *Consumer Requirement*

Defendants contend that because Plaintiffs' Assignors are commercial entities, they cannot assert claims pursuant to the consumer protection laws of Hawaii, Michigan, New York, Virginia, West Virginia, and Wisconsin, which limit such laws to traditional consumer transactions. (Moving Br., at 53.) I address the law of each state in turn.

### a. *Hawaii*

The Hawaii Unfair and Deceptive Practices Act ("Hawaii UDAP") permits corporate

entities to sue only for "unfair methods of competition."  Haw. Rev. Stat. § 480-2 (stating that "[n]o person other than a consumer, the attorney general, or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section," but permitting "[a]ny person [to] bring an action based on unfair methods of competition declared unlawful by this section"); *see also Kam Ctr. Speciality Corp. v. LWC IV Corp.*, 169 P.3d 980 (Hawaii 2007) ("Because Defendants are a corporation, they are a 'person' within the meaning of [the Hawaii UDAP] and, thus, qualify to bring an action for unfair competition.").  Defendants argue that this claim must be dismissed because Plaintiffs fail to allege the "nature of the competition" underlying the alleged violation.  (Reply Br., at 21.)  I agree. Plaintiffs allege, in conclusory fashion, that "Defendants' conduct with respect to the Scheme constitutes 'unfair methods of competition' under the UDAP."  (Compl. ¶ 360.)  This is plainly insufficient.  *See, e.g.*, *Davis v. Four Seasons Hotel Ltd.*, 228 P.3d 303, 308–09 (Hawaii 2010) (dismissing Hawaii UDAP claim where plaintiffs failed to allege the "nature of the competition" in their complaint).  Accordingly, Plaintiffs' claim under the Hawaii UDAP will be dismissed without prejudice.

### b.    *Michigan*

The Michigan Consumer Protection Act ("MCPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," and defines "trade or commerce" as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes."  Mich. Comp. Laws. §§ 445:903(1), 445.902(1)(g).  In other words, "if an item is purchased primarily for business or commercial rather than personal purposes, the MCPA does not supply protection."  *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 393 (Mich. Ct. App. 1999); *see also German Free State of Bavaria v. Toyobo Co., Ltd.*, 480 F. Supp.

2d 958, 968–69 (W.D. Mich. 2007); *Slobin v. Henry Ford Health Care*, 666 N.W.2d 632, 634 (Mich. 2003).

Defendants argue that Plaintiffs' claim under the MCPA should be dismissed because the statute's protections do not extend to businesses.  However, the MCPA plainly permits any "person", defined as "an individual, corporation, limited liability company, trust, partnership, incorporated or unincorporated association, or other legal entity," to recover  under the statute. *See* Mich. Compl. Laws §§ 445.911(2), 445.902(1)(d).  The Assignors clearly fall into this definition.  Further, I am satisfied that Plaintiffs have alleged that their Assignors purchased the test strips for their enrollees—individuals with diabetes—"who use [them] for a personal or household purpose." *Sanofi II*, 2020 WL 831578, at *9.  As such, Plaintiffs may maintain a claim under the MCPA.

### c.    *New York*

Defendants next contend that Plaintiffs cannot maintain a claim under the New York General Business Law ("NYGBL") because Plaintiffs' claims are not "consumer oriented." Plaintiffs, however, contend that their New York claims survive because they allege that Defendants' conduct has a broader impact on consumers at large.

Section 349 of the NYGBL prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." *WorldHomeCenter.com, Inc. v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 498 (S.D.N.Y. 2011) (quoting N.Y. Gen. Bus. Law § 349(a)).  To state a claim under this section, a plaintiff must allege that the allegedly misleading conduct "was consumer oriented."  *See id.*  This requirement "may be satisfied by showing that the conduct at issue potentially affects similarly situated consumers" and has "a broad impact on consumers at large."  *Id.*  For example, in *Blue Cross & Blue Shield of*

*New Jersey, Inc. v. Phillip Morris USA Inc.*, health insurance companies alleged that tobacco companies violated section 349 because the tobacco companies "induced consumers to smoke and discouraged them from quitting smoking." 344 F.3d 211, 218–19 (2d Cir. 2003). Unlike in *Blue Cross & Blue Shield of New Jersey*, however, Defendants here did not communicate the AWPs directly to consumers. Rather, the transactions involved in the alleged scheme "are between . . . sophisticated businesses." *Sanofi II*, 2020 WL 831578, at *10. That the scheme may have tangentially affected consumers does not, in and of itself, make Plaintiffs' claim "consumer-oriented." Accordingly, Plaintiffs' claim under the NYGBL is dismissed without prejudice.

### d.    *Virginia*

Defendant contends that claims under the Virginia Consumer Protection Act of 1977 ("VCPA") are "reserved for consumers only." (Reply Br., at 21.) I disagree.

The VCPA "makes it unlawful for a supplier to make certain misrepresentations 'in connection with a consumer transaction.'" *Alexander v. Southeastern Wholesale Corp.*, 978 F. Supp. 2d 615, 622 (E.D. Va. 2013) (quoting Va. Code § 59.1-200(A)). Virginia courts are split on the issue of whether the VCPA applies more broadly than just between "a supplier and the ultimate consumer." *See id.* ("Virginia courts appear to be split on the issue of whether a transaction between suppliers is covered by the VCPA.") However, "[f]ederal courts, in contrast, have been consistent in their interpretation of the VCPA, holding that a direct sale to a consumer is not required for the transaction to be covered by the VCPA." *Id.* (citing *Branin v. TMC Enterprises, LLC*, 832 F. Supp. 2d 646, 650 (W.D. Va. 2011)). For example, in *Branin*, the Western District of Virginia found that plaintiff stated a claim under the VCPA where the defendant supplier of a used car sold the car to a motor vehicle dealer, because the supplier "knew or should have known that the car was likely to be resold to a consumer to be used for personal purposes." 832 F. Supp.

2d at 650.  Here, Defendants undoubtedly knew that its test strips products were ultimately used for personal purposes, irrespective of the business transactions alleged.  Accordingly, Plaintiffs may maintain their claim under the VCPA.

### e. *West Virginia*

Defendants argue that Plaintiffs' claim under the West Virginia Consumer Credit and Protection Act ("WVCCPA"), must be dismissed because the WVCCPA limits its protections to traditional consumer transactions.  In support of their argument, Defendants rely on the Southern District of West Virginia's decision in *Ballard v. Bank of America, N.A.*, No. 12-2496, 2013 WL 5963068, at *9 (S.D. W. Va. Nov. 7, 2013), in which the court explained that only a consumer, defined as a "natural person" can proceed with a claim under section 46A-5-101(1).  Plaintiffs, here, however, do not proceed with a claim under that section.  Rather, Plaintiffs assert a claim pursuant to section § 46A-6-106(a), which creates a private cause of action for "any person who purchases or leases goods or services and thereby suffers an ascertainable loss of money or property, real or personal."  W. Va. Code § 46A-6-106(a).  "Person" is defined under that section as a "natural person or an individual, and an organization."  *Id.* § 46A-1-102(31).  Because Plaintiffs contend, and Defendants do not dispute, that an organization can be a person under West Virginia law, they have standing to proceed with such a claim.  Ultimately, however, Plaintiffs' claim under the WVCCPA fails because they have not alleged that their Assignors are "purchasers" of any goods or services.  *See id.* § 46A-6-106(a).  Plaintiffs' WVCCPA claim is dismissed with prejudice.

### f. *Wisconsin*

Defendants argue that Plaintiffs cannot proceed with a claim under the Wisconsin Deceptive Trade Practices Act ("WDTPA"), because Plaintiffs' Assignors are not members of "the

public."  To state a claim under the WDTPA, "a plaintiff must allege: (1) a defendant made a representation to the public with intent to induce an obligation; (2) the representation was untrue, deceptive, or misleading; and (3) the representation caused the plaintiff a pecuniary loss."  *Sanofi II*, 2020 WL 831578, at *11 (citing *K&S Tool & Die Corp. v. Perfection Mach. Sales, Inc.*, 732 N.W.2d 792, 798 (Wis. 2007)).  In other words, to proceed with a claim under the WDTPA, the plaintiff must be a member of the "public."  *See K&S Tool & Die Corp.*, 732 N.W.2d at 799.  A plaintiff is considered a member of the public "unless a particular relationship exists between him and the defendant."  *Sanofi II*, 2020 WL 831578, at *11.  Typically, this "refers to a contractual relationship, a 'particular relationship' can exist absent a contract where the plaintiff and defendant had an 'ongoing relationship' to purchase goods."  *Id.* (quoting *Uniek, Inc. v. Dollar Gen. Corp.*, 474 F. Supp. 2d 1034, 1039 (W.D. Wis. 2007)).

Here, Plaintiffs' Assignors arguably had an ongoing relationship with Defendants, however indirect.  The Assignors, through their PBMs, placed Defendants' test strip products on their formularies and paid the claims of its enrollees for Defendants' products.  These allegations demonstrate a "particular relationship" between Plaintiffs' Assignors and Defendants.  *See Sanofi II*, 2020 WL 831578, at *11 ("Plaintiffs' claims stem from an ongoing contractual relationship between Plaintiffs' Assignors and PBMs.").  Because of this particular relationship, Plaintiffs and their Assignors are not members of the public that can proceed with a claim under the WDTPA.  Plaintiffs' claims under the WDTPA are, therefore, dismissed.

### 2.  *Direct Link*

Defendants submit that Plaintiffs' consumer protection claims under Arizona, Idaho, and Massachusetts law fail because those statutes require some direct link between Plaintiffs and Defendants' alleged misrepresentations.  Again, I discuss the law of each state, in turn.

### a. *Arizona*

Subsequent purchasers cannot proceed with a private cause of action under the Arizona Consumer Fraud Act ("ACFA"). *Sullivan v. Pulte Home Corp.*, 290 P.3d 446, 454 (Ariz. Ct. App. 2012), *vacated in part on other grounds*, 306 P.3d 1 (Ariz. 2013). Indeed, Arizona courts have concluded that "[t]he purpose of the [ACFA] is to provide injured consumers with a remedy to counteract the disproportionate power often present in consumer transactions." *Id.* (quoting *Waste Mfg. & Leasing Corp. v. Hambicki*, 900 P.2d 1220, 1224 (Ariz. Ct. App. 1995)). "Because a subsequent purchaser is not a party to the original transaction and therefore would not encounter this 'disproportionate bargaining power,' such a purchaser is not within the class of consumers intended to be protected by the implied private cause of action under the [ACFA]." *Id.*

Not acknowledging a bar on claims by subsequent purchasers, Plaintiffs argue that the ACFA does not require a direct merchant-consumer transaction. In support of this argument, Plaintiffs rely on *Watts v. Medicis Pharm. Corp.*, 365 P.3d 944, 953 (Ariz. 2016), in which the Arizona Supreme Court held that the ACFA "does not expressly require a direct merchant-consumer transaction." *Watts*, however, is distinguishable. There, the plaintiff received from her pharmacist an informational insert about her prescription medication. *Id.* at 947. The informational insert was provided by the drug manufacturer and made certain safety warnings about the medication. *Id.* Plaintiff suffered serious side effects from using the drug and sued the drug manufacturer under the ACFA based on misrepresentations allegedly made in the informational insert about the drug's safety. *Id.* at 947–48. The defendant drug manufacturer argued that plaintiff could not proceed with a claim under the ACFA because "there is no direct merchant-consumer transaction between drug manufacturers and patients." *Id.* at 952–53. The Arizona Supreme Court found that despite the absence of a direct merchant-consumer transaction,

plaintiff's receipt of an informational insert received directly from the manufacturer sufficed to state a claim under the ACFA. *Id.* Here, as discussed above, there is no dispute that Plaintiffs are subsequent purchasers that did not directly purchase Defendants' products; in fact there are no allegations that Plaintiffs or their Assignors had any contact with Defendants. As such, Plaintiffs cannot proceed with a claim under the ACFA. *See, e.g.*, *Sanofi I*, 2019 WL 1418129, at *18 (dismissing claim under the ACFA where plaintiffs "never allege they are the direct purchasers of the insulin from Defendants and readily admit that they are multiple purchasers down the chain of commerce").[18] Accordingly, Plaintiffs' claim under the ACFA is dismissed with prejudice.

### b.    *Idaho*

Defendants argue that Plaintiffs' claim under the Idaho Consumer Protection Act ("ICPA") fails because Plaintiffs have not alleged any contract between their Assignors and Defendants. The Idaho Supreme Court has explained that "the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively." *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010); *see also Dreyer v. Idaho Dep't of Health & Welfare*, 455 F. Supp. 3d 938, 952 (D. Idaho 2020) ("In order to have standing under the ICPA, 'the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively.'"). Courts considering the scope of the ICPA, however, have observed that "it is not clear from *Taylor* what kind of contractual relationship the court was contemplating; in other words, it is not clear that the court was necessarily requiring a direct contract between the plaintiff and defendant (immediate privity)." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 102122 (N.D. Cal. 2018). In that regard, courts have

---

[18]    I further note that in *Sanofi II*, plaintiffs attempted to make this same argument, and failed. *See Sanofi II*, 2020 WL 831578, at *12.

permitted claims under the ICPA to proceed where plaintiffs had contracts with others parties that resulted in their purchase of the defendant manufacturers' products. *See id.* ("Here, Plaintiffs appear to have contracts with, *e.g.*, dealers that resulted in the Class Vehicles being purchased."); *see also Insulin Pricing Litig.*, 2019 WL 643709, at *19. I agree. Defendants have not demonstrated that Plaintiffs are required to show direct privity with Defendants to maintain their claim under the ICPA. The failure to plead privity, therefore, is not fatal to Plaintiffs' claim.

### c. *Massachusetts*

Defendants contend that Plaintiffs cannot state a claim under Massachusetts law, because there is no business connection between Defendants and the Assignors. To state a claim under section 11 of the Massachusetts General Laws, which provides a private right of action for unfair trade practices, a plaintiff must show "the parties are engaged in more than a minor or insignificant business relationship." *In re Pharmaceutical Industry Average Wholesale Price Litigation ("AWP II")*, 582 F.3d 156, 192–93 (1st Cir. 2009). "What, specifically, constitutes a 'minor or insignificant business relationship' has not been fully fleshed out in the Massachusetts courts, but it has been described as requiring that 'there must exist some commercial relationship between the parties or the plaintiffs must demonstrate that the defendants' actions interfered with trade or commerce.'" *Id.* For example, in *AWP II*, the First Circuit held that third-party payors, like Plaintiffs' Assignors, could bring fraud and misrepresentation claims against a drug manufacturer for published inflated AWPs under section 11 despite a lack of privity between plaintiffs and defendants. *Id.* at 193–94. The same holds true here. Plaintiffs have alleged Defendants manipulated the cost of their drugs, knowing that it would increase the amount that Plaintiffs' Assignors would pay. This constitutes an "ongoing business relationship between [Defendants] and [the Assignors that] cannot be said to be minor or insignificant." *See id.* Accordingly,

Defendant's motion to dismiss Plaintiffs' consumer protection claim under Massachusetts law is denied.

### 3. *Justifiable Reliance*

Finally, Defendants, in short shrift, assert that the consumer protection laws of Michigan, Nevada, and Pennsylvania require some form of justifiable reliance or due diligence by the plaintiff. Defendants further argue that Plaintiffs have not alleged this element since "Plaintiffs' Assignors knew about the PBM rebates and that they were not reflected in wholesale prices." (Moving Br., at 56.) However, as discussed above, I find that Plaintiffs have sufficiently alleged that their Assignors relied on Defendants' alleged misrepresentations. Further, I do not agree with Defendants that Plaintiffs' Assignors should have known that their AWPs did not constitute reasonable reimbursement benchmarks. This argument is based on a mischaracterization of Plaintiffs' claims. Indeed, Defendants appear to contend that Plaintiffs take issue with the WAC or the system of providing rebates to PBMs, generally. Those, however, are not the gist of Plaintiffs' allegations in this regard. Instead, Plaintiffs allege that Defendants, in order to cover the significant rebates they pay to PBMs, have artificially inflated the AWPs for their test strip products in order to recoup their profits. While Plaintiffs' Assignors clearly should have understood the structure of the system in which PBMs receive rebates, Plaintiffs sufficiently allege that they were justified in treating the AWP as it is commonly used in the industry—as a reimbursement metric for third-party payors. Indeed, Plaintiffs allege that Defendants published their AWPs knowing that they did not, in fact, constitute a reasonable reimbursement metric. Plaintiffs relied on those AWPs to their detriment. This is sufficient to show justifiable reliance. Hence, Plaintiffs' consumer protection claims arising out of Michigan, Nevada, and Pennsylvania are not dismissed on these bases.

### iv.  *Unjust Enrichment*

Plaintiffs, finally, assert unjust enrichment claims against Defendant under Illinois and Pennsylvania law.  Defendants argue that these claims must be dismissed because Plaintiffs have not alleged that Defendants retained any benefits to the detriment of Plaintiffs.

Under Pennsylvania law, "[u]njust enrichment is . . . an equitable doctrine," that requires a plaintiff show "benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of value." *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000).  Defendants contend that Plaintiff cannot state such a claim because of the "distance" between Plaintiffs' Assignors and Defendants.  In other words, Defendants argue that Plaintiffs' claim fails because they do not have a direct relationship with Plaintiffs' Assignors.  Plaintiffs, however, submit that Pennsylvania courts "have rejected the requirement that a plaintiff directly confer a benefit on a defendant in order to allege unjust enrichment."  *See Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006).  I agree.  Plaintiffs allege that the inflated prices paid by its Assignors did confer a benefit on Defendants—increased profits and market share.  *See TAP*, 885 A.2d at 1137–38.  This is sufficient to state a claim for unjust enrichment under Pennsylvania law.

The same holds true for Plaintiffs' unjust enrichment claim under Illinois law.  To state a claim of unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011).  Again, this claim survives because Plaintiffs have alleged that they conferred a benefit on Defendants to their detriment.  Accordingly,

Defendants' motion to dismiss Plaintiffs' unjust enrichment claims is denied.

## IV.    CONCLUSION

For the reasons set forth herein, Defendants' Motion to Dismiss is **GRANTED** in part and **DENIED** in part, as follows:

1. Plaintiffs' RICO claims (Counts X to XII), and their claims under the Arizona Consumer Fraud Act, West Virginia Consumer Credit and Protection Act, and Wisconsin Deceptive Trade Practices Act are **DISMISSED WITH PREJUDICE**.

2. Plaintiffs' claims under the Hawaii Unfair or Deceptive Acts and Practices and New York General Business Law are **DIMISSED WITHOUT PREJUDICE**.

3. Plaintiffs' common law fraud and unjust enrichment claims under New Jersey and Indiana law are **DISMISSED** as withdrawn.

4. Defendants' Motion to Dismiss is **DENIED** with respect to the common law fraud and unjust enrichment claims under Illinois and Pennsylvania law, and the claims pursuant to the Arkansas Deceptive Trade Practices Act, Connecticut Unfair Practices Act, Delaware Consumer Fraud Act, Delaware Uniform Deceptive Trade Practices Act, Florida Deceptive and Unfair Trade Practices Act, Idaho Consumer Protection Act, Indiana Deceptive Consumer Sales Act, Massachusetts Regulation of Business Practice & Consumer Protection Act, Michigan Consumer Protection Act, Minnesota Private Attorney General Statute & Consumer Fraud Act, Minnesota Uniform Deceptive Trade Practices Act, Nebraska Consumer Protection Act, Nevada Deceptive Trade Practices Act, New Hampshire Consumer Protection Act, New Mexico Unfair Trade Practices Act, North Dakota Unlawful Sales or Advertising Practices Law, Ohio Deceptive Trade Practices Act, Pennsylvania Unfair Trade and Consumer Protection Law, South

Carolina Unfair Trade Practices Act, Tennessee Consumer Protection Act, and Virginia Consumer Protection Act of 1977.

An appropriate Order accompanies this Opinion.

DATED:  May 28, 2021                    /s/ Freda L. Wolfson
                                        Freda L. Wolfson
                                        U.S. Chief District Judge